IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GWENDOLYN D. SIKES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 1:13cv353-CSC |
| ) | (WO) |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

**I.  Introduction**

The plaintiff applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq., alleging that she was unable to work because of a disability. Her application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ concluded that the plaintiff was not under a "disability" as defined in the Social Security Act. The ALJ, therefore, denied the plaintiff's claim for benefits. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[1] *See Chester v. Bowen*, 792

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

F.2d 129, 131 (11th Cir. 1986).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge.  The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be affirmed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

> To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[2]  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).³

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. The Issues

**A. Introduction.** The plaintiff was 36 years old at the time of the hearing before the ALJ and had completed the twelfth grade. (R. 51). Following the hearing, the ALJ concluded that the plaintiff has severe impairments of "status post pericardial effusion;

---

³ *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

endocarditis[4]; right hip bursitis; diabetes; hepatitis C; anxiety; depression; headaches; and history of substance abuse, not material and in reported remission." (R. 32) (footnote added). Her prior work experience includes work as a secretary, payroll clerk, and waitress. (R. 38). The ALJ concluded that Sikes could not perform any of her past relevant work, (*id.*), but that she had the residual functional capacity to perform less than the full range of light work. (R. 34). Relying on the testimony of a vocational expert, the ALJ concluded that there were jobs existing in significant numbers in the national economy that Sikes could perform. (R. 39). Consequently, the ALJ concluded that she was not disabled. (R. 40).

    **B. Plaintiff's Claims.** The plaintiff presents two issues for the court's review. As stated by the plaintiff, the issue are as follows:

1. The Commissioner's decision should be reversed because the ALJ failed to properly apply the two-part "pain standard" established by the Eleventh Circuit.

2. The Commissioner's decision should be reversed because the ALJ failed to include any accommodations for Ms. Sikes' severe impairment of headaches in her RFC assessment.

(Pl's Br., doc. # 12 at 3).

## IV. Discussion

    A disability claimant bears the initial burden of demonstrating an inability to return to her past work. *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990). In determining

---

[4] Endocarditis is an inflammation of the inside lining of the heart chambers and heart valves and can be caused by a bacterial infection.

whether the claimant has satisfied this burden, the Commissioner is guided by four factors: (1) objective medical facts or clinical findings, (2) diagnoses of examining physicians, (3) subjective evidence of pain and disability, e.g., the testimony of the claimant and her family or friends, and (4) the claimant's age, education, and work history. *Tieniber v. Heckler*, 720 F.2d 1251 (11th Cir. 1983). The court must scrutinize the record in its entirety to determine the reasonableness of the ALJ's decision. *See Walker,* 826 F.2d at 999. The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review. *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981). The ALJ must also state, with sufficient specificity, the reasons for her decision referencing the plaintiff's impairments.

> *Any* such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual *shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.*

42 U.S.C. § 405(b)(1) (emphases added).

**A. Pain analysis**. Sikes contends that the ALJ failed to properly apply the pain standard, and thus her testimony should be taken as true, leading to a finding of disability. As explained below, the ALJ did not fully credit Sikes' testimony. "Subjective pain testimony supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the plaintiff complains is *itself* sufficient to sustain a finding of disability." *Hale v. Bowen*, 831 F.2d 1007 (11th Cir. 1987). The

Eleventh Circuit has established a three-part test that applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Landry v. Heckler,* 782 F.2d 1551, 1553 (11th Cir. 1986); *see also Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). This standard requires evidence of an underlying medical condition *and either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) an objectively determined medical condition of such severity that it can reasonably be expected to give rise to the alleged pain. *Landry,* 782 F.2d at 1553. In this circuit, the law is clear. The Commissioner must consider a claimant's subjective testimony of pain if she finds evidence of an underlying medical condition and the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain. *Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir. 1986); *Landry*, 782 F.2d at 1553. Thus, if the Commissioner fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, the Commissioner has accepted the testimony as true as a matter of law. This standard requires that the articulated reasons must be supported by substantial reasons. If there is no such support then the testimony must be accepted as true. *Hale*, 831 F.2d at 1012.

At the administrative hearing, Sikes testified that pain is the basis for her disability claim. (R. 53-54). She testified that she has

> chest pain all the time. Three to four times out of a month, I have severe pains coming from my left side. Probably about seven or eight times a month, I – it's hard for me to even get out of the bed. If I do anything – it doesn't matter what it is I try to do, and I do try to do something because I don't want to feel

> worthless, you know, I want to be able to do something around the house. And – but I have to take – I, I can do something for probably about 10 minutes, at the most, and that's something light. Usually, if I go to put clothes in the washing machine, I'll take that break that they're in the washing machine before I, you know, to put them in the dryer. But I have to take that break. Any steps that I go up or down, I have to hold on to something or I'll fall. I'm weak all the time. I have migraines, severe migraines. I just – I'm – I understand how there are jobs out there that I could sit down at and do, but in – I don't think it would be fair to the employer of the absentees that I'll be, and I know I'll be late, because every single day it takes me two to three hours to get ready just to go anywhere.

(*Id.*)

The ALJ recited Sikes' testimony and discussed the medical evidence. The ALJ acknowledged that Sikes has "medically determinable impairments that could reasonably be expected to cause some of her alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (R. 36). If this were the extent of the ALJ's credibility analysis, the plaintiff might be entitled to some relief. However, a review of the ALJ's analysis demonstrates that the ALJ properly considered and discredited Sikes' testimony. Rather than give a synopsis of it, the court will quote it.

> At the hearing, the claimant testified that she is disabled due to her numerous impairments. (Hearing testimony). She claimed chronic chest pain on a daily basis, with severe episodes occurring 3 - 4 times a month. Her heart problems also included shortness of breath and hot flashes/sweating, with any activity. She further claims having low energy and fatigue since having heart problems, and stated that she could lift no more than a gallon of milk. She alleged having severe migraine headaches 7 - 8 times a month, but admitted only taking over-the-counter pain medications. The claimant testified to having

occasional pain in her right hip, and confirmed diagnoses for diabetes and hepatitis C; however, she admitted no significant functional limitations to these impairments. She also carries diagnoses for anxiety and depression, but admitted that she is not taking any medications and is not receiving any treatment at this time.  The claimant alleged that she has not taken any medications for her (sic) any of her impairments and has not returned to her treating doctor since 2009, because she could not afford the medicine or office visits.  She admitted having a history of substance abuse problems, but claimed that ended 6 - 7 years ago. Despite her allegedly disabling symptoms, the claimant admitted she is able to live with her parents and brother, share household responsibilities with her mother, care for her own personal needs, and care for her mother who has cancer and drive her to chemotherapy every Wednesday.  She and her mother take the opportunity on those days to shop at Walmart, and the claimant admitted that she is able to walk alongside her mother, who rides in a motorized cart, for up to 15 minutes.  The claimant also admitted that she is able to do laundry, watch TV, care for her three dogs (2 Pomeranians and 1 poodle), prepare simple meals, reads the newspaper every morning and enjoys hobbies like crafts and sewing.

*   *   *

The undersigned finds that the longitudinal medical evidence does not support the severity of impairments alleged or the presence of disabling physical impairments that would preclude claimant from all work.  The claimant underwent a consultative examination, performed by Myrtle Goore, M.D., on August 18, 2011, and the results of this examination are inconsistent with the claimant's allegation of total disability. (Exhibit 15F). The claimant's chief complaints included heart problems and endocarditis.  She complained of shortness of breath with activity and recent irregular heartbeats, but admitted that she had been off all medications due to costs.  Dr. Goore noted that the claimant had not been compliant with her present medications since November 2011,[5] and the claimant denied any medication specifically for her heart. On physical examination, Dr. Goore observed that the claimant had a healed surgical scar over the lower sternum; PMI was normal size and location in mid-clavicular line; there was systolic ejection murmur at LSB 1-2/6, but heart sounds S1 and S2 were normal; nor S3 or S4; no click, heave or thrill palpated; no JV distension; and no HJ reflux at 45 degrees.  The claimant also

---

[5] This date appears to be a scrivener's error as Dr. Goore noted that Sikes reported she had not been complaint with her medications since November 2009. (R. 475).

8

had normal findings and ranges of motion in her extremities and back; she demonstrated the ability to get on and off the examination table without problems, used no assistive device, station was normal and there was no ataxia/spacticity; and she was able to squat, heel/toe walk and tandem walk. Motor, sensory and reflexes were all normal; seated leg raising was negative; no atrophy noted in her muscles; and fine and gross manipulation was normal. Dr. Goore's diagnostic impression included heart murmur-tricuspid murmur, but no signs of congestive heart failure, and she noted that while the claimant has followed up with the cardiologist, no specific treatment has ever been prescribed for heart rhythm or congestive heart failure.  Dr. Goore also diagnosed the claimant with anxiety and depression, based upon her subjective complaints, but noted that she had not been taking any medication for this condition, since November 2009.  Again, allegedly due to inability to afford the medication.

\*   \*   \*

Based upon the longitudinal medical record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of her symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.  The classification of claimant's exertional level to less than a Full Range of light work accommodates her physical and mental impairments.  The claimant testified that she had not sought treatment from a cardiologist since September 2009.  She has prescribed medications for depression and anxiety but is not taking them, and she is also not seeking mental health treatment.  Her activities of daily living are not consistent with a finding of disability in that she is able to live at home with her mother, father and brother, without any reported difficulty.  She is helping care for her mother, who has cancer and drives her mother to chemotherapy sessions.  In addition, the claimant is able to perform some chores, goes grocery shopping, has a driver's license and drives.  She watches TV, does laundry, feeds her 3 dogs and prepares simple meals.  She does not need help dressing or bathing.  The claimant also stated that she liked doing crafts and sewing.

To the extent that the claimant allege that she has been unable to afford medical treatment/medication, Social Security Rulings 87-6 and 82-59 provide that a claim of financial inability to obtain prescribed treatment is only a justifiable cause for failure to follow the prescribed treatment when free

community resources are unavailable. While the claimant testified that she has tried some free clinics and they have not treated her because she is applying for disability, there is no evidence to support this claim. At the hearing she also admitted that she was going to check into another free medical service provider, but never followed through. (Hearing testimony). In any event, the record provides that the claimant has actually sought medical care when she felt it was medically necessary; as evidenced by her ER treatments in May and August 2009. (Exhibits 2F and 5F).

In sum, the evidence of record does not support the claimant's allegations of totally incapacitating symptomataology. The record fails to document persistent, reliable manifestations of a disabling loss of functional capacity by the claimant resulting from her reported symptomataology. After considering the entirety of the record, the undersigned concludes that the claimant would not be precluded from performing the physical and mental requirements of less than the full range of light work, on a regular and sustained basis.

(R. 35-38).

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995); *Jones v. Dept. of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "'the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" *Foote*, 67 F.3d at 1562, *quoting Tieniber*, 720 F.2d at 1255 (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court). The ALJ has discretion to discredit a plaintiff's subjective complaints as long as she provides "explicit and adequate reasons for [her] decision." *Holt,*

921 F.2d at 1223. Relying on the treatment records, objective evidence, and Sikes' own testimony, the ALJ concluded that her allegations regarding the extent of her pain were not credible to the extent alleged and discounted that testimony. After a careful review of the ALJ's careful and thoughtful analysis, the court concludes that the ALJ properly discounted the plaintiff's testimony and substantial evidence supports the ALJ's credibility determination. It is undisputed that the plaintiff suffers from pain. However, the ALJ concluded that while Sikes' underlying conditions are capable of giving rise to some pain and other limitations, her impairments are not so severe as to give rise to the disabling intractable pain she alleged.

The medical records support the ALJ's conclusion that while Sikes' impairments could reasonably be expected to produce some pain, Sikes was not entirely credible in her description of her symptoms or her pain. For example, Sikes testified that she suffers from severe migraines and it takes her two to three hours to get ready to go somewhere. (R. 54). However, she further testified that she takes her mother to chemotherapy treatment each week and then goes grocery shopping with her. (R. 58). She also testified that she makes her bed, does her laundry, feeds her dogs, and cleans her own room. (*Id*.). Although Sikes testified that she has "chest pain all the time," she has not seen her cardiologist since 2009. (R. 54-55).

Furthermore, the medical records do not corroborate her testimony of debilitating pain. In May 2009, Sikes presented to the Southeast Alabama Medical Center complaining

that she was "blue." (R. 272). She was diagnosed with a tension headache. (R. 274). At that time, she indicated that she had chronic headaches only occasionally. (R. 282). Her breathing was clear. (R. 284). On May 21, 2009, Sikes was admitted to Flowers Hospital complaining of right hip pain and chest pain. (R. 288-89). An MRI of the pelvis showed "very minimal uptakes on either side," and an MRI of the lumbar spine "revealed mild degenerative changes in the lower lumbar spine but no other significant abnormality." (*Id*.) During her hospitalization, Sikes complained of generalized aches and pains and a low grade fever. (R. 293) She was subsequently diagnosed with tricuspid endocarditis secondary to staph aureus. (R. 291, 300-01). She was discharged on June 4, 2009. (R. 311)

Sikes presented to her treating physician, Dr. Diana Mancuso, on June 22, 2009, complaining of increased shortness of breath. (R. 311). Sikes was readmitted to Flowers Hospital on June 25, 2009. (*Id*.) During that hospitalization, Sikes underwent surgery to create a pericardial window to drain fluid from her heart. (R. 304, 307, 318). Prior to her discharge, Dr. David Hewitt noted that "[s]he should be cured from her endocarditis at this point and she has no other signs of ongoing infection." (R. 308).

Sikes was seen by Dr. Mancuso on July 8, 2009. At that time, Dr. Mancuso noted that Sikes "does not appear to be in any distress whatsoever including any type of respiratory distress." (R. 390). Dr. Mancuso noted that there was "no evidence of infection," and Sikes denied "any upper respiratory distress." (*Id*.)

On July 22, 2009, Sikes presented to Dr. Mancuso and reported that she "felt overall

better since her last visit." (R. 386). Dr. Mancuso refilled Sikes' prescriptions for Lortab and Ambien. (*Id*.) Dr. Mancuso saw Sikes on August 4, 2009. (R. 385). Sikes was "in no distress." (*Id*.) Nonetheless, at Sikes' request, Dr. Mancuso refilled Sikes' prescription for Lortab 10 and prescribed Xanax for anxiety. (R. 384).

Sikes next presented to the emergency room at Flowers Hospital on August 8, 2009, complaining of a headache. (R. 328). At that time, she had no difficulty breathing, and her heart rate was tachycardic with regular rhythm. (R. 328-30).

On August 10, 2009, Sikes requested a refill for Lortab. Because she had an appointment scheduled for August 11, 2009, the prescription was not refilled. (R. 383). Sikes did not keep her appointment on August 11, but she was seen by Dr. Mancuso on August 12, 2009. (R. 383-82). Sikes reported that her headaches were better. (R. 382). Dr. Mancuso refilled her prescription for Lortab. (*Id*.)

Sikes was also referred at Dr. Planz's office because of a "questionable infected area of her pericardial window incision." (R. 332). On August 12, 2009, Sikes reported to Dr. Planz's office that she was taking Singulair, Lortab, Ambien and Xanax, and she requested more Lortab. (*Id*.) She was emotional and complained of anxiety, unable to breath and "too weak to do anything." (*Id*.) The physician's assistant noted that "[a]s far as her symptoms of shortness of breath, weakness, and left side chest pain, [he was] not sure what this could be." (*Id*.) He further noted

> Her chest x-ray that she had performed on 8/8/09 shows that there is no significant pleural effusion and her heart size seems within normal limits. This

>is confirmed by clear breath sounds at both bases. . . . As far as her wound goes, I think this will heal uneventfully. . . . I will not give her a refill of her Lortab 10, as I think this medication is not necessary for the surgery that we performed.

(R. 332-33).

On August 18 and 21, 2009, Sikes called Dr. Mancuso's office requesting refills of Lortab. (R. 381-82). Dr. Mancuso declined to call in refills but offered Sikes an appointment on August 22, 2009. (R. 381). On August 22, 2009, Dr. Mancuso's office called Sikes to again offer her an appointment. Sikes declined but requested refills of Lortab and Xanax. (*Id.*) Dr. Mancuso did not refill her prescriptions because Sikes refused the appointment. (*Id.*)

On September 1, 2009, Sikes presented to Dr. Mancuso complaining of worsening anxiety and depression due to martial difficulties with her husband. (R. 381). Dr. Mancuso diagnosed Sikes with stress related headaches, depression and anxiety. (R. 380). Sikes was directed to check with her insurance company about mental health coverage and Dr. Mancuso prescribed Paxil for her depression. Dr. Mancuso also refilled Sikes' prescriptions for Lortab and Xanax. (*Id.*)

On September 25, 2009, Sikes complained to Dr. Mancuso of vomiting, although she was "not in acute distress" when Dr. Mancuso saw her. (R. 379). She requested refills of Lortab, Ambien and Xanax. (*Id.*) Dr. Mancuso prescribed Phenergan for nausea and refilled her prescriptions for Ambien, Xanax and Lortab. (R. 378-79).

Dr. Mancuso last saw Sikes on September 30, 2009. At that time, Sikes reported that

she "felt better since her last visit." (R. 377). Dr. Mancuso noted that "[s]he looks generally well, in fact better than I have seen her in the past few months." (*Id.*)

During a consultative psychological evaluation on December 31, 2009, Sikes reported that she was suffering from congestive heart failure and depression. She reported her current medications were Ambien, Xanax and Lortab. (R. 454).

During a consultative physical examination on August 18, 2011, Sikes complained of shortness of breath and irregular heart beats. (R. 475). Sikes also revealed that she had not been compliant with her medications since November 2009. (*Id.*) Dr. Goore noted that Sikes' breathing was "normal. No retractions, wheezing or use of accessory muscles of respiration." (R. 476). In addition, Dr. Goore noted that Sikes "[g]ets on and off the examination table without problems. Uses no assistive device. Station is normal and no ataxia or spasticity. Is able to squat, heel/toe walk and tandem walk." (*Id.*) Finally, while Dr. Goore diagnosed Sikes with "[h]eart murmur - tricuspid murmur," she noted "[n]o signs of congestive heart failure." (R. 477).

After a careful review of the record, the court concludes that the ALJ's reasons for discrediting the plaintiff's testimony were both clearly articulated and supported by substantial evidence. To the extent that the plaintiff is arguing that the ALJ should have accepted her testimony regarding her pain, as the court explained, the ALJ had good cause to discount her testimony. This court must accept the factual findings of the Commissioner if they are supported by substantial evidence and based upon the proper legal standards.

*Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987).

    **B. Headaches**. Sikes also asserts that the ALJ failed to include limitations from her headaches in her residual functional capacity assessment. (Doc. # 12 at 7 & 9). The ALJ concluded that the plaintiff has the residual functional capacity

> to perform less than the Full Range of light work as defined in 20 CFR § 404.1567(b) and 416.967(b). The claimant is able to lift and carry 10 pounds frequently and 20 pounds occasionally; sit for a total of 6 hours during an 8 hour workday; stand and walk for a total of 4 hours during an 8 hour workday; frequently use the upper and lower extremities for pushing and pulling; occasionally bend, stoop, kneel, crouch, crawl and climb ramps and stairs; frequently balance; precluded from climbing ladders ropes and scaffolds; no limitation on reaching, handling, fingering and feeling; precluded from exposure to extreme heat and cold; no work around hazardous machinery or unprotected heights; able to perform simple routine tasks involving no more than simple, short instructions and simple work related decisions with few work place changes.

(R. 34).

    An ALJ is required to independently assess a claimant's residual functional capacity "based upon all of the relevant evidence." 20 CFR § 404.1545(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence."); 20 C.F.R. § 404.1546(c) ("Responsibility for assessing residual functional capacity at the administrative law judge hearing . . . level. If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *See also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite [her] impairments."). "Residual

functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms. 20 C.F.R. § 416.945(a)." *Peeler v. Astrue,* 400 Fed. Appx. 492, 494 n.2 (11th Cir. 2010).

It is clear from the context of the ALJ's opinion, and from the record as a whole, that the ALJ reviewed and considered all the medical evidence in the record in determining Sikes' RFC. The court has independently considered the record as a whole and finds that the record provides substantial support for the ALJ's conclusions. Consequently, the court concludes there was sufficient medical evidence before the ALJ from which she properly could made a residual functional capacity assessment.

To the extent that Sikes asserts that the ALJ's RFC determination is flawed because it does not include the severity of her headaches, she is entitled to no relief. It is undisputed that Sikes suffers from headaches. However, the medical records do not demonstrate that the headaches are as severe as alleged. For example, when she presented to the hospital in May 2009, Sikes reported that she only occasionally suffered from headaches. (R. 282). The medical record demonstrates that Sikes' headaches are tension or stress related, and she testified that she takes over the counter medication for them. (R. 56). Although Sikes testified that she suffers from "really bad, severe migraine (sic) about seven times out of a month, seven to eight times out of a month," (*id.*), the medical record does not support her testimony. In fact, the medical records demonstrate that Sikes complained of headaches only

17

three times – on May 16, 2009, August 8, 2009, and September 1, 2009.[6]  (R. 274-85; 328; 381).  Thus, the court concludes that the ALJ's RFC decision is supported by substantial evidence.

## V.  Conclusion

The court has carefully and independently reviewed the record and concludes that the decision of the Commissioner is supported by substantial evidence and is due to be affirmed.

A separate order will be entered.

Done this 13th day of May, 2014.

                    /s/Charles S. Coody
                    CHARLES S. COODY
                    UNITED STATES MAGISTRATE JUDGE

---

[6] On August 12, 2009, she reported to Dr. Mancuso that her headaches were better.  (R. 382).